[Cite as *State v. Olsen*, 2011-Ohio-3420.]

## IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### CLARK   COUNTY

STATE OF OHIO      :

          :   Appellate Case No. 09-CA-110

   Plaintiff-Appellee   :

          :   Trial Court Case No. 09-CRB-1285

v.           :

          :   (Criminal Appeal from Clark County

JOHN B. OLSEN      :    Municipal Court)

          :

   Defendant-Appellant  :

          :

. . . . . . . . . . .

### O P I N I O N

Rendered on the 8th day of July, 2011.

. . . . . . . . . . .

ELIZABETH H. SMITH, Atty. Reg. #0079180, City of Springfield Prosecutor's Office, 50 east Columbia Street, 4th Floor, Springfield, Ohio 45502
  Attorney for Plaintiff-Appellee

RONALD BOBLITT, Atty. Reg. #0033097, 2 West Columbia Street, Suite 220, Springfield, Ohio 45502
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant John B. Olsen appeals from his conviction and sentence for Assault.  He contends that deficiencies in the trial transcript deprive him of the opportunity for meaningful appellate review; that the trial court erred in excluding his testimony concerning a statement made to him by the alleged victim, on hearsay grounds; that his trial

counsel was ineffective; that the trial court erred by limiting his voir dire of the alternate juror; that his conviction is against the manifest weight of the evidence; and that the cumulative effect of multiple errors deprived him of a fair trial.

{¶ 2} We conclude that the deficiencies in the trial transcript only cloud one aspect of the trial from review – that being the trial court's having sustained the State's objections to two exhibits offered by Olsen. Even if it is assumed that the trial court erred by excluding these two exhibits, Olsen was able to establish, by other evidence, the facts he was seeking to prove with these exhibits. Therefore, any error in this regard was harmless.

{¶ 3} We agree with Olsen that the trial court erred in excluding his testimony concerning a statement made to him by the alleged victim, on hearsay grounds, but we conclude that this error was harmless.

{¶ 4} We conclude that the strategic decisions made by Olsen's trial counsel, of which he complains, do not constitute ineffective assistance of counsel.

{¶ 5} We conclude that the trial court was within its discretion in limiting Olsen's voir dire examination of the alternate juror at one point. Furthermore, the alternate juror was excused before deliberations, not having been needed, and the point Olsen was seeking to make, concerning the presumption of innocence, had been made repeatedly during Olsen's voir dire. Therefore, even if the trial court erred in its limitation of Olsen's voir dire of the alternate juror, the error was harmless.

{¶ 6} We conclude that Olsen's conviction is not against the manifest weight of the evidence.

{¶ 7} Finally, we conclude that all of the trial court's errors, including errors assumed

for purposes of analysis, when cumulated, did not deprive Olsen of a fair trial.

{¶ 8} Accordingly, the judgment of the trial court is Affirmed.

I

{¶ 9} The events giving rise to this appeal occurred on the night, and ensuing early morning hours, of St. Patrick's Day, 2009, at the Legends Bar in Enon, Ohio. Astonishingly, it appears that all of the actors in this drama had imbibed alcoholic beverages, to at least some extent.[1]

{¶ 10} The complaining witness, Leslie Grout, arrived at Legends at about 4:30 in the afternoon. Olsen arrived in the early evening. Olsen and Grout were each accompanied by an entourage of friends.

{¶ 11} Grout testified that Olsen pursued her all evening with unwanted advances. Olsen denied this. He testified that Grout became upset with him when he would not support her in a nude dance contest.

{¶ 12} Grout testified that Olsen struck her on two occasions. The first was inside the bar. It does not appear that she was significantly injured at this time. The manager of Legends, Jerry Dempsey, asked Olsen to leave, and Olsen went outside.

{¶ 13} The second assault occurred outside, but in the immediate vicinity of the bar, about 20 to 30 minutes later. Grout described this incident as follows:

{¶ 14} "Q. So did he approach from the parking lot?

{¶ 15} "A. Right.

---

[1] We will allow that the police officers who responded to the scene had not imbibed alcoholic beverages, but they came along after the fact.

{¶ 16} "Q. Okay. And your back was turned to the parking lot?

{¶ 17} "A. Um hum.

{¶ 18} "Q. Okay. What happened at that point when he came back?

{¶ 19} "A. Um I had on two Saint Patrick's Day beads . . .

{¶ 20} "Q. Okay.

{¶ 21} "A. . . . and he proceeded just to kind of, you know, grab the back of 'em and pull me through, over the fence, and that's when I was actually directly hit in my left eye.

{¶ 22} "Q. Okay. So he came up behind you and pulled the necklaces?

{¶ 23} "A. Right and they broke and . . .

{¶ 24} "Q. Okay. And then, was it the force of the necklaces being pulled, is that what pulled you over?

{¶ 25} "A. And I being caught off guard, I wasn't expecting anyone to . . .

{¶ 26} "Q. Okay. Now did you, when you went over the fence, did you land on the ground on the other side?

{¶ 27} "A. Right.

{¶ 28} "Q. Okay. Where where [sic] did you where did you land at, on your back?

{¶ 29} "A. I ki [sic] yeah like on my back, shoulder.

{¶ 30} "Q. Okay. And you stated that Mr. Olsen again hit you?

{¶ 31} "A. Yes.

{¶ 32} "Q. Okay. Did he reach down and do that?

{¶ 33} "A. Yes.

{¶ 34} "Q. Okay. And where on you body did he hit you?

{¶ 35} "A.  On my left eye.

{¶ 36} "Q.  So in the same place again?

{¶ 37} "A.  Right.   But the first time it was more over, not directly on my eye.

{¶ 38} "Q.  Okay.   And, again, was it a slap, was it an open fist or a closed . . .

{¶ 39} "A.  That was a closed fist.

{¶ 40} "Q.  That was a closed fist?

{¶ 41} "A.  Um hum."

{¶ 42} Grout testified that she had some swelling and bruising to her left eye for two weeks after she was struck.  She had her father, who had been a paramedic for many years, look her over, but did not otherwise seek medical attention.

{¶ 43} After the second assault, Grout called for the police, who responded to the scene.

{¶ 44} Olsen denied striking Grout.  He testified that she had his hat, and as he walked up to her to retrieve the hat, she swung her beads at him.  Olsen testified that in the course of blocking the swinging beads, he grabbed her hand, and Grout's body went frontwards over the railing, but did not go all the way over.  According to Olsen, an off-duty Enon police officer at the bar told him to leave, and the officer would bring Olsen his hat.  Olsen testified that he then started walking to his ride, with Grout chasing after him.  With Grout still chasing after him, Olsen got into the truck with his friends, and they left.

{¶ 45} Both Olsen and Grout had friends who testified.  Each set of friends provided some corroboration for the party who called them, but there were some discrepancies in the testimony, which is not surprising, considering the setting.  Also, not every witness was in a

position to observe all the events as they transpired.

{¶ 46} Dempsey, the manager of Legends, was called as a defense witness. He did not appear to be friends with either Olsen or Grout.

{¶ 47} Olsen was charged with one count of Assault, in violation of R.C. 2903.13(A), a first-degree misdemeanor. Following a jury trial, he was convicted, and sentenced accordingly. From his conviction and sentence, Olsen appeals.

II

{¶ 48} Olsen's First and Second Assignments of Error are as follows:

{¶ 49} "THE APPELLANT WAS PREJUDICED AND DENIED A FAIR TRIAL BY THE TRIAL COURT'S FAILURE TO PROVIDE A SUITABLE ENVIRONMENT FOR HIS TRIAL IN COMPLIANCE WITH CRIMINAL RULE 22.

{¶ 50} "THE TRIAL COURT'S FAILURE TO COMPLY WITH APPELLATE RULE 9(E) TO CORRECT THE RECORD OTHER THAN BY REITERATING ITS PRIOR RULINGS MANDATES THE AMENDED RECORD BE ADOPTED AS POSITED BY TRIAL COUNSEL'S AFFIDAVIT."

{¶ 51} In support of both of these assignments of error, Olsen complains that a noisy ventilation system in the courtroom resulted in many gaps in the transcript of the trial, which was the subject of an audio recording system. He points out that he did not become aware of this problem until the transcript was prepared, so that he could not make it the subject of a contemporaneous objection.

{¶ 52} The State points out that Crim. R. 22 only requires the recording of trial proceedings in petty offense cases if either party requests that they be recorded, and the

offense in this case, being punishable by 180 days in jail, at most, is not a serious offense, as defined in Crim. R. 2. To this, Olsen makes the reasonable reply that because the proceedings were presumably being recorded, he could not have been expected to make a request that they be recorded.

{¶ 53} We find it unnecessary to determine whether Olsen had to request that the proceedings be recorded. Assuming that he was entitled to rely upon the apparent fact that the proceedings were being recorded, we find no failure that had the effect of denying him a fair trial.

{¶ 54} We have reviewed the entire transcript. Although there are occasional "inaudibles" scattered throughout, the only parts of the transcript where these interfere significantly with appellate review concern two sidebar conferences concerning Olsen's request to admit two exhibits into evidence. The sidebar conferences are admittedly unintelligible. The only thing that can be gleaned from the record is that the exhibits were not admitted into evidence.

{¶ 55} We have the two exhibits – Defendant's Exhibits 4 and 5. Even if we assume that the trial court erred in excluding these exhibits, we find that the error was harmless.

{¶ 56} Exhibit 4 is a judgment entry of conviction of one of the State's witnesses (one of Grout's friends who testified) for Theft, a felony of the fifth degree. The exhibit also includes provisions for restitution and community control sanctions and conditions. The only permissible use of this evidence would be to show, for purposes of impeachment, that the witness was convicted of felony Theft. Immediately following the ruling excluding Exhibit 4, Olsen elicited the witness's admission that he had been convicted of felony Theft in Clark

County on November 25, 2008. This is the most that Olsen was allowed to establish under Evid. R. 609. The witness's unrebutted admission that he had been convicted established this fact to the uttermost extent that Olsen was allowed to establish it.

{¶ 57} Exhibit 5 is the arrest report in this case. In his cross-examination of Sheriff's Deputies Jason Patton and Bradley Tillman, the officers who responded to the scene, Olsen elicited that they each "believed" that pictures were taken of Grout. The arrest report reflects that no pictures were taken of the victim. From our review of Exhibit 5, this is the only significance it could possibly have – serving to impeach the officers' testimony. But Olsen established, in his cross-examination of both officers, that the arrest report reflected that no pictures were taken of the victim. Furthermore, during a recess, a check was made, and Officer Patton was recalled as a witness. He acknowledged that there were no photographs of the victim, and that he was mistaken when he testified that he believed pictures had been taken.

{¶ 58} Thus, for whatever it was worth, the point was irrefutably established that the officers responding to the scene were both mistaken in their belief that photos had been taken. This was the only value that the admission of Exhibit 5 could possibly have been to Olsen. Therefore, if the trial court erred in excluding Exhibit 5, that error was harmless.

{¶ 59} We conclude that the deficiencies in the audio recording system, leading to gaps in the transcript, did not deprive Olsen of a fair trial, or of meaningful appellate review. We also find no fault in the trial court's performance of its duties under App. R. 9(E). The trial court supplemented the record to the extent of its ability to do so. Olsen's First and Second Assignments of Error are overruled.

III

{¶ 60} Olsen's Third Assignment of Error is as follows:

{¶ 61} "JOHN B. OLSEN WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO CONSTITUTION."

A.   Voir Dire – Where There's Smoke, There's Fire

{¶ 62} Olsen first complains about his trial counsel's colloquy with a prospective juror:

{¶ 63} "MR. COX: Now some people might say well, there must be somethin' here, or this guy wouldn't be charged.  And nobody has nobody has [sic] that in mind, right? Because that's just that's that's just [sic] not the way it works.  Does anybody have the idea well there's gotta be something here.  They wouldn't charge with guy [sic] and have him come to court and ...

{¶ 64} "MS. ILGES: (inaudible)

{¶ 65} "MR. COX: Pardon me?

{¶ 66} "MS. ILGES: I said I didn't until you said something.

{¶ 67} "MR. COX: Well . . .

{¶ 68} "MS. ILGES: (inaudible)

{¶ 69} "MR. COX: Can I push rewind?  Um, well Mrs. Ilges how do you feel about that now?

{¶ 70} "MS. ILGES: 'Cause when you said it it was just like well he has a point.  It

was just like (inaudible) he has a point. What he just said makes kind of since [sic].

**{¶ 71}** "MR. COX: Okay. Well, the person charged is presumed innocent. And you've heard that before? You understand that? And they remain innocent unless and until the State can prove its case. Okay? And you're okay with that?

**{¶ 72}** "MS. ILGES: Yes.

**{¶ 73}** "MR. COX: Okay. Now the State's the only party in the courtroom that's required to prove anything. You're okay with that?

**{¶ 74}** "MS. ILGES: Yes.

**{¶ 75}** "MR. COX: Brad's not required to prove anything. And I guess what I'm wanting to know is whether you can keep that in mind, how important it is that Brad's presumed innocent, prosecutor has that burden of proof beyond a reasonable doubt, and that Brad doesn't have to prove anything, present evidence, or testify. He's not required to do any of that. You can keep that in mind?

**{¶ 76}** "MS. ILGES: Yes sir.

**{¶ 77}** "MR. COX: Okay. And the other members, you can keep those things in mind?

**{¶ 78}** "(no audible response)."

**{¶ 79}** Interestingly, the *State* exercised a peremptory challenge to keep the prospective juror in this colloquy off the jury.

**{¶ 80}** The notion that "where there's smoke, there's fire"; that a defendant would not have been charged with an offense, and everyone go to the trouble of prosecuting him, if he wasn't guilty, is a common concern of criminal defense lawyers. And like any bias, the best

way to deal with it is usually to get it into the open and discredit it.

{¶ 81} We find no ineffectiveness of trial counsel here. Throughout the voir dire, defense counsel was at pains to remind the jury, repeatedly and eloquently, about the presumption of innocence and the State's burden of proof.

## B.   Counsel Elicits Olsen's Lewd Behavior

{¶ 82} On cross-examination, State's witness Josh Thomas testified that he had three beers over a three-and-a-half hour period, so that he wasn't drinking very much. The cross-examination then proceeded as follows:

{¶ 83} "Q.   Okay.   You weren't intoxicated or anything like that?

{¶ 84} "A.   No.

{¶ 85} "Q.   Okay.   And we've gone through your written statement.   Did um did Mr. Ol, did you see any did you see Mr. Olsen do anything else that night that was, shall we say, out of the ordinary?

{¶ 86} "A.   Uh yes I did.

{¶ 87} "Q.   And what was that?

{¶ 88} "A.   Uh prior to him grabbing Ms. Ms. [sic] Grout and trying to pull her over rail, he exposed himself to me and uh questioned my manhood on more than one occasion, and he flipped off several people standing in the uh patio area of the bar.

{¶ 89} "Q.   You said he he [sic] exposed himself to you?

{¶ 90} "A.   Yes.

{¶ 91} "Q.   And what exactly does that mean?

{¶ 92} "A.   He unzipped his pants and pulled out his penis and shook it directly at me.

{¶ 93} "Q.  Okay.   And where exactly did this take place in the . . .

{¶ 94} "A.  It was on . . .

{¶ 95} "Q. . . . bar area or patio . . .

{¶ 96} "A.  It was it was [sic] on the sidewalk in front of the bar.

{¶ 97} "Q.  Okay.   Now it's Saint Patrick's Day and this is a bar and after midnight, pretty packed?

{¶ 98} "A.  There was a fair crowd there, yes.

{¶ 99} "Q.  A fair crowd?

{¶ 100} "A.  Yeah.

{¶ 101} "Q.  About how many?

{¶ 102} "A.  Uh I'd say probably between sixty and seventy people were still there at that point.

{¶ 103} "Q.  Between sixty and seventy?

{¶ 104} "A.  (inaudible response)

{¶ 105} "Q.  Can you show the jury, or tell the jury, where in your written statement you mention this exposure?

{¶ 106} "A.  Uh right here where it says he made gestures towards me and other people in the crowd.

{¶ 107} "Q.  Okay.   I thought you said he flipped people off?

{¶ 108} "A.  He did.

{¶ 109} "Q.  Now that would be gestures, right?

{¶ 110} "A.  Yes.

{¶ 111} "Q.   But you're saying pulling out his penis and flashing it around, you just . . .

{¶ 112} "A.   Yes.

{¶ 113} "Q. . . . write that up as a gesture?

{¶ 114} "A.   That is a gesture in fact, is it not?

{¶ 115} "Q.   Well I don't deny it's a gesture, I'm asking you if you in your sober state, would write that up as simply a gesture to a law enforcement officer.

{¶ 116} "A.   I I [sic] would probably go into more detail in a sober state, yes.

{¶ 117} "Q.   You would have gone into more detail in a sober state?

{¶ 118} "A.   Probably, yes."

{¶ 119} Olsen contends that his trial counsel was ineffective for having elicited from Thomas, on cross-examination, that Olsen had exposed himself that night.   To begin with, it is not entirely clear whether Olsen's trial counsel knew that Thomas would so testify.   Even if he did, this might have been a trial strategy.   Having elicited, intentionally or not, Thomas's testimony about Olsen's having exposed himself, counsel used the fact that Thomas had not referred to this in his written statement to get Thomas to acknowledge that he might have been more under the influence of alcohol than he had thought.

{¶ 120} The Legends manager, Jerry Dempsey, was called as a defense witness.   The decision to call Dempsey is another bone of contention – see Part III-E, below.   Although Dempsey did not actually see Olsen expose himself, that was because he looked away just as it appeared that Olsen was about to do so.   Counsel elicited some helpful testimony from Dempsey that he, Dempsey, never saw Olsen strike Grout.   Counsel may have concluded that

by paying one price – the testimony that Olsen exposed himself – he could reap two benefits – Thomas's admission that he might have been more under the influence than he thought, and Dempsey's testimony that he never saw Olsen strike Grout. And counsel may have concluded that those two benefits were worth the price.

{¶ 121} Had we been Olsen's trial counsel, we might not have elicited the testimony concerning his having exposed himself. But trial counsel is allowed wide latitude in formulating trial strategy, and we cannot say that trial counsel's choice of strategy in this regard amounted to ineffective assistance of counsel.

C. The Striking of Olsen's Testimony Concerning Grout's Lewd Conduct

{¶ 122} Olsen next complains about the following evidentiary ruling during his direct testimony:

{¶ 123} "A. Well uh we're there at the bar for maybe about an hour. Uh Leslie Grout, the woman that already testified, uh she was entered in that contest and felt that she had a good chance of winning it. She had already collected more beads than anyone else in the bar because her nudity was far more ramped than anyone else's.

{¶ 124} "MRS. SMITH [representing the State]: Objection Your Honor.

{¶ 125} "THE COURT: Sustained. The dury [sic] jury will disregard that last statement."

{¶ 126} This is not, of course, an ineffective assistance of counsel claim; it is a claim that the trial court erred when it sustained the State's objection.

{¶ 127} Evid. R. 403(A) provides that: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice,

of confusion of the issues, or of misleading the jury." Olsen's statement concerning Grout's "ramped" nudity has little, if any, relevance to any issue in this case. Besides potentially prejudicing the jury against Grout, this testimony ran the risk of distracting the jury from its task of determining whether Olsen assaulted Grout.

{¶ 128} We cannot say that the trial court abused its discretion by determining that the danger of unfair prejudice or of confusing the issues outweighed any probative value that this testimony might have had.

### D. An Erroneous Hearsay Ruling

{¶ 129} Immediately after the colloquy set forth in Part III-C, above, the following occurred:

{¶ 130} "Q. Brad [Olsen] let's just stick with what what [sic] took place as far as the incident we're talking about.

{¶ 131} "A. Alright.

{¶ 132} "Q. So go go [sic] on.

{¶ 133} "Q. When when [sic] she got up for her turn to dance, and was supposed to be bikinis, she mentioned before she even got up to dance to me that she was going to be nakeder than anyone and that we needed to cheer so she could . . .

{¶ 134} "MRS. SMITH: Objection hearsay.

{¶ 135} "THE COURT: Sustained. The jury will disregard that statement."

{¶ 136} Again, this is not a claim of ineffective assistance of counsel; it is a claim that the trial court erred in sustaining the State's objection.

{¶ 137} We agree that the trial court erred. Grout's out-of-court statement was not

being offered to prove the truth of the matter asserted – "that she was going to be nakeder than anyone and that we needed to cheer" – but merely to prove that she made the statement. It was not hearsay.

{¶ 138} But we find this error to have been harmless. Grout's out-of-court statement that was excluded does not appear to have any relevance to the charge of Assault. We find it unlikely in the extreme that the admission of this testimony would have led to a different outcome.

E. Trial Counsel's Decision to Call Jerry Dempsey, the Manager of Legends

{¶ 139} Olsen next complains about his trial counsel's decision to call Jerry Dempsey, the manager of the bar, as Olsen's final witness. He asserts that he instructed his counsel not to call Dempsey, and supports this assertion with his statement, during allocution at sentencing, to that effect. Olsen was not under oath, and not subject to cross-examination, when he made that statement. Nor did the State have any opportunity to rebut it. Therefore, we cannot take it as established, in this direct appeal from Olsen's conviction, that he instructed his trial counsel not to call Dempsey.

{¶ 140} Dempsey's testimony was a mixed bag. To some extent, he corroborated Josh Thomas's testimony that Olsen had exposed himself at one point:

{¶ 141} "Q.  Did you ever see him [Olsen] expose himself that night?

{¶ 142} "A.  Uh I turned around.   He was getting to that point and I didn't look.

{¶ 143} "Q.  Okay.

{¶ 144} "A.  But I I [sic] that's why I can't say he did . . .

{¶ 145} "Q.  From com . . .

{¶ 146} "A. . . . for sure . . .

{¶ 147} "Q. . . . from comments.

{¶ 148} "A. . . . but I the shirt was comin' up and the belt was and I turned around then."

{¶ 149} But Dempsey, who did not appear partial either to Olsen or to Grout, also testified that he did not see Olsen engage in any fighting:

{¶ 150} "Q.   Okay.   Well one witness uh testified earlier today, and wrote a statement on the night in question, claiming that 'I saw him,' and he's speaking of Brad Olsen there, 'I saw him hit Leslie [Grout] in the mouth and the bar owner broke it up,' is that true?

{¶ 151} "A.   When I I [sic] was inside when whatever happened happened.   When I walked outside uh the he was not engaged in any fighting.   He was actually in front, out of the patio, and she was still in the patio.

{¶ 152} "Q.   Okay.

{¶ 153} "A.   So . . .

{¶ 154} "Q.   So that is a . . .

{¶ 155} "A. . . . I did not break up a fight between him and anybody that night.

{¶ 156} "Q.   Okay.   Uh that was that was [sic] my next question actually.   So you didn't break up any fight involving Brad Olsen and any other person that night?

{¶ 157} "A.   He was not engaged in any fighting when I was outside.   When I went out there she was inside, he was on the he was on the [sic] sidewalk in front of Legends."

{¶ 158} With Dempsey, a seemingly neutral witness, Olsen's counsel was able to contradict the testimony of a State's witness that the bar owner had broken up an altercation

between Grout and Olsen, and also to establish that Dempsey, the manager, never saw Olsen engage in any fighting. We conclude that the value of this testimony to the defense outweighed any prejudicial effect of the corroboration of Thomas's testimony that Olsen had exposed himself. Therefore, trial counsel was not ineffective in having made the strategic decision to call Dempsey as a witness.

{¶ 159} Olsen's Third Assignment of Error is overruled.

IV

{¶ 160} Olsen's Fourth Assignment of Error is as follows:

{¶ 161} "THE TRIAL COURT ABUSED ITS DESCRETION [sic] AND PREJUDICED THE DEFENDANT WHEN IT SUA SPONTE DURING VOIR DIRE CURTAILED COUNSEL'S EXPLORATION OF THE LEGAL MAXIM OF A DEFENDANT'S INNOCENCE UNTIL PROVEN GUILTY."

{¶ 162} The subject of this assignment of error concerns the voir dire of the alternate juror. Just before this, during the voir dire of the final member of the jury, proper, Olsen's counsel was permitted to engage in the following colloquy with the prospective juror:

{¶ 163} "MR. COX: Um you know what I'm going to ask you. Um Brad Olsen here is presumed innocent.

{¶ 164} "MRS. ADAMSON: Yes sir.

{¶ 165} "MR. COX: And if you were rendering a verdict at this very moment, your verdict would be not guilty, wouldn't it?

{¶ 166} "MRS. ADAMSON: Without knowing any of the facts, yes sir.

{¶ 167} "MR. COX: Yes. Without the State having proved its case beyond a

reasonable doubt.

{¶ 168} "MRS. ADAMSON: Yes sir.

{¶ 169} "MR. COX: Because that's what we're here to see if they can do. And that you wouldn't   you wouldn't [sic] uh insist that Brad prove his innocence.

{¶ 170} "MRS. ADAMSON: Correct.

{¶ 171} "MR. COX: You would only judge whether the State met its burden of proof.

{¶ 172} "MRS. ADAMSON: Yes."

{¶ 173} After this prospective juror was passed for cause, becoming the final member of the regular jury, an alternate juror was called for voir dire. After preliminary questioning by the trial court, the State asked no questions, and passed for cause. Defense counsel then proceeded as follows:

{¶ 174} "MR. COX: Thank you Your Honor.   Good morning Ms. Copeland.

{¶ 175} 'MRS. COPELAND: Good morning.

{¶ 176} "MR. COX: So if you were to render a verdict right now in this case . . .

{¶ 177} "THE COURT: I'm not go [sic] it's a hypothetical question.   The jurors aren't called upon to render verdicts before evidence is presented, so I'm not going to permit that question."

{¶ 178} Defense counsel then carefully explained the presumption of innocence and the State's burden of proof beyond reasonable doubt, and elicited from the alternate juror that she would keep that in mind. Counsel then passed for cause, and the jury, including the alternate juror was sworn.

{¶ 179} Olsen contends that the trial court erred when it wouldn't allow him to

propound to the alternate juror the question concerning what verdict she would render "right now."

{¶ 180} We can only speculate as to why the trial court would not allow this question, when it had permitted a similar question during the voir dire of the preceding juror. Perhaps the trial court was troubled by the lack of a foundation – the presumption of innocence – for the question. But even if the trial court erred in preventing this question from being asked, the error would be harmless beyond reasonable doubt.

{¶ 181} The alternate juror was not called upon to serve during deliberations, all of the regular jurors having been available. If the presumption of innocence and the State's burden of proof had been a horse, it would have been beaten to death long before the voir dire of the alternate juror. We do not mean this observation to be a criticism of defense counsel. This was a case with conflicting testimony, and the presumption of innocence and the State's burden of proof were vital to Olsen's defense. But we find no reasonable possibility that the trial court's having prevented Olsen from propounding this one question to the alternate juror could have led to any confusion on the part of any members of the jury concerning the burden of proof and the presumption of innocence.

{¶ 182} Olsen's Fourth Assignment of Error is overruled.

V

{¶ 183} Olsen's Fifth Assignment of Error is as follows:

{¶ 184} "APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 185} "When a conviction is challenged on appeal as being against the manifest

weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387.

{¶ 186} The testimony of eyewitnesses Grout, Thomas and Anthony Emberton was clear that Olsen struck Grout in the eye on at least one occasion. The inevitable discrepancies in the testimony of these witnesses can largely be explained by their having been in different positions at different times, so that they did not all see the same thing.

{¶ 187} The testimony of eyewitnesses Justin Webb, Jacob Burnett, Michael Whipp, and Olsen, himself, contradicted the State's witnesses. The bar manager, Dempsey, testified that he did not see Olsen engage in any fighting. But he did not testify that he was always necessarily in a position to have seen everything that transpired between Olsen and Grout.

{¶ 188} The testimony of the State's eyewitnesses was not inherently incredible. It is primarily for the trier of fact, who sees and hears the witnesses, to sort out conflicting testimony. *State v. Lawson* (August 22, 1997), Montgomery App. No. 16288. In the case before us, we cannot say that the jury lost its way, resulting in a manifest miscarriage of justice.

{¶ 189} Olsen's Fifth Assignment of Error is overruled.

VI

{¶ 190} Olsen's Sixth Assignment of Error is as follows:

{¶ 191} "THE CUMULATIVE ERROR EFFECT OF THE NUMEROUS ERRORS

DEPRIVED DEFENDANT A FAIR TRIAL."

{¶ 192} The only clear error we have found was the trial court's ruling that one of the questions put to Olsen on direct examination called for inadmissible hearsay. This had no discernible impact on the outcome. If we assume that the trial court erred in its ruling that Defendant's Exhibits 4 and 5 were inadmissible, and in its having prevented the one voir dire question to the alternate juror, who did not serve during deliberations, and if we cumulate those assumed errors with the one erroneous hearsay ruling, the cumulative effect of those errors is still negligible. All of them had virtually no impact on the outcome of the proceedings, having related to matters that were tangential in the extreme.

{¶ 193} Olsen's Sixth Assignment of Error is overruled.

VII.

{¶ 194} All of Olsen's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN and HALL, JJ, concur.


Copies mailed to:

Elizabeth H. Smith
Ronald Boblitt
Hon. Thomas E. Trempe