[Cite as *State v. Pence*, 2024-Ohio-5121.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                          :
                                       :
        Appellee                       :    C.A. No. 30039
                                       :
v.                                     :    Trial Court Case No. 2021 CR 03294
                                       :
BARRY BEARADENO PENCE II               :    (Criminal Appeal from Common Pleas
                                       :    Court)
        Appellant                      :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on October 25, 2024

. . . . . . . . . . .

DAVID R. MILES, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Barry Bearadeno Pence II appeals from his conviction

for aggravated burglary, aggravated murder, and tampering with evidence.  For the

reasons set forth below, we affirm.

## I. Factual and Procedural History

{¶ 2} On September 20, 2021, J.W. was found dead in his home. Following an autopsy, it was determined that he had been stabbed 21 times, including two stab wounds to his left lung and four to his heart.

{¶ 3} Huber Heights police detective Elizabeth Hogue was assigned to investigate the death. The victim's family informed her that the victim had been in a relationship with Pence. Hogue interviewed Pence the same day the body was found. The interview took place at the residence of his parents, with whom he lived. When questioned, Pence indicated he had not seen the victim for a couple of months. He and his father provided the police with voicemails from the victim in which the victim had threatened to post information on Facebook about Pence's family. Pence told Hogue he had spent most of the evening of September 18 at home with his parents. He stated that he also had gone to the home of his friend Hunter Dice, where he stayed from approximately 10:00 p.m. until 6:00 a.m. on September 19. Hogue observed a cut on Pence's hand; Pence said he got it "from the batting cages." Tr. p. 493. Pence's father mentioned that Pence is bipolar.

{¶ 4} Hogue subsequently spoke to Hunter Dice, who stated that Pence had not stayed at his home the entire night. Dice also indicated that, while at his house, Pence had stated that he "felt the need to harm someone" who he claimed had been harassing his family. Pence used the first name of the victim when he made this statement.

{¶ 5} Hogue obtained an analysis of Pence's cell phone records, which indicated that he had left Dice's home at 3:26 a.m. on the morning of September 19, 2021. The records also indicated that Pence's phone was in the Huber Heights area by 3:45 a.m. and was near the victim's residence from 3:48 a.m. until 4:09 a.m. Footage from surveillance cameras depicted Pence's vehicle traveling on South Dixie Drive at 4:18 a.m. and depicted a car similar to Pence's driving near the victim's home at the time of the murder.

{¶ 6} On September 29, 2021, Pence was interviewed a second time. The interview took place at the Huber Heights police station and lasted less than 90 minutes. While Pence was seated in an interview room, Hogue provided him with a pre-interview form outlining his constitutional rights. Hogue read each of five enumerated rights set out on the form to Pence, and Pence stated that he understood his rights. He also wrote his initials beside each right as it was explained. Pence then read aloud the following acknowledgement of rights as set forth at the bottom of the form:

> I fully understand the above five statements of my rights. No threats or promises have been made to me by anyone. I understand that signing this form is not a confession to any crime. With the understanding of these rights, I am willing to speak with you without a lawyer present.

Thereafter, Pence made a notation at the bottom of that statement indicating that he had completed 12 years of schooling and was able to read and write. Pence signed the form, which was then also signed by Hogue.

{¶ 7} During the interview that followed, Pence admitted that he had left Dice's

home, gone to a gas station, and purchased a knife. He then went to the victim's home and entered through an unlocked door. Pence hid in the back of the home to wait for the victim to fall asleep. He then proceeded to stab the victim. After leaving the victim's residence, Pence disposed of the knife in a nearby river. He also changed clothes and disposed of his bloody clothing in a trashcan at a local McDonald's.

{¶ 8} Toward the end of the interview, Hogue provided Pence with a statement form and asked him to write out his version of the event. The detectives then left the interview room. Among other things, Pence wrote that he had gone to the victim's house, gone inside, and waited for the victim to go to sleep, whereupon he stabbed the victim.

{¶ 9} Pence was placed under arrest. On October 8, 2021, he was indicted as follows: Count One, aggravated burglary (deadly weapon); Count Two, aggravated burglary (serious physical harm); Count Three, aggravated murder (prior calculation/design); Count Four, aggravated murder (while committing aggravated burglary); Count Five, felonious assault (deadly weapon); Count Six, felonious assault (serious physical harm); Count Seven, murder (proximate result); Count Eight, murder (purposeful); Count Nine, tampering with evidence (alter/destroy); and Count Ten, tampering with evidence (alter/destroy).

{¶ 10} Pence filed a motion seeking to determine his competency to stand trial and his sanity at the time of the offense. The trial court granted the motion and referred Pence to the Forensic Psychiatry Center for Western Ohio for an evaluation by Dr. Scott Kidd. Pence subsequently requested a second evaluation to be performed by Dr. Richard Bromberg, and the request was granted. Thereafter, the State sought to have

a third evaluation. The court ordered a third evaluation, which was performed by Dr. Jamie Adkins.

{¶ 11} Pence also filed a motion to suppress his statements to the police during the interviews at his residence and at the police station. Following a hearing, the trial court denied that motion.

{¶ 12} A jury trial was held in December 2023. Following five days of trial, the jury found Pence guilty on all charges. At the sentencing hearing on January 16, 2024, the trial court merged counts one and two (the aggravated burglaries), and the State elected to proceed to sentencing on count one. The trial court also merged counts three, four, five, six, seven, and eight (the aggravated murders, murders, and felonious assaults), and the State elected to proceed to sentencing on count three (aggravated murder). The court imposed a sentence of "twenty (20) years to life" for aggravated murder. Pence was sentenced appropriately on the other charges, and those sentences were ordered to run concurrently with the aggravated murder sentence.

{¶ 13} Pence appeals.

## II.     Suppression of Statements

{¶ 14} Pence's first assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS STATEMENTS.

{¶ 15} Pence challenges the trial court's decision to overrule his motion to suppress statements made during the interview conducted at the Huber Heights police

station on September 29, 2021.

{¶ 16} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. To ensure the protection of this right, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436 (1966), have been followed. "*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed." *State v. Petitjean*, 140 Ohio App.3d 517, 523 (2d Dist.2000).

{¶ 17} In his appellate brief, Pence acknowledges he was properly advised of his *Miranda* rights, that he signed the pre-interview waiver form, and that he agreed to speak with the police officers. Nonetheless, he argues that his statements should have been suppressed because he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights. In support, he claims that he had a limited education and no prior experience with the criminal justice system and that the police knew he suffered from schizophrenia and bipolar disorder.

{¶ 18} "Whether a confession is voluntary and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings are analytically separate issues." *State v. Kelly*, 2005-Ohio-305, ¶ 10 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428 (2000). "The Due Process Clause requires an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." (Citations

omitted.) *Id.* "This due process test takes into consideration the totality of the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Id.* "Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." *Id.* Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986), citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

{¶ 19} While a defendant's mental condition may be a "significant factor in the 'voluntariness' calculus," it "is but one factor in the totality of circumstances to be considered in determining voluntariness." (Citations omitted.) *State v. Hughbanks*, 2003-Ohio-4121, ¶ 61. Further, "a defendant's mental condition, by itself and apart from its relation to official coercion, [does not] ever dispose of the inquiry in constitutional 'voluntariness.' " *Id.* Likewise, even if having only a high school education were considered "a limited education," as Pence claims, it would not necessarily equate to having a low intellect or indicate that he was unable to understand and waive his rights. *See State v. Kyles*, 2023-Ohio-489, ¶ 30. Finally, a "written waiver of rights . . . is strong proof" that the waiver was valid. *State v. Clark*, 38 Ohio St.3d 252, 261 (1988), citing *North Carolina v. Butler*, 441 U.S. 369 (1979).

{¶ 20} We have reviewed the transcript of the suppression hearing, the exhibits submitted at the hearing, and the video recording of Pence's interrogation by the police.

The entire encounter lasted approximately 90 minutes, including the time during which Pence wrote his statement. During that time frame, Pence was provided with the opportunity to go to the restroom and was given a drink.

{¶ 21} The record demonstrates that Pence is an adult with a high school education and the ability to read and write. There was nothing on the video to indicate that Pence's mental status was impaired. He did not appear intoxicated or otherwise unable to function. There was no indication of confusion or inability to understand the rights as explained to him by Det. Hogue. Pence was able to answer questions appropriately, and his demeanor was consistent with a reasonably intelligent 22-year-old man. The video showed that the tone throughout the interview was calm and conversational. Further, the police did not make any promises or threats or otherwise coerce Pence to make his statements in any manner.

{¶ 22} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. . . . Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 23} After reviewing the record, we find that the totality of the circumstances

surrounding Pence's interview supported the finding that his *Miranda* waiver was a free and deliberate choice made without coercion. The totality of the circumstances also supported the finding that Pence understood his *Miranda* rights and that he had the requisite capacity to waive them. Accordingly, the trial court properly concluded that Pence knowingly, intelligently, and voluntarily waived his *Miranda* rights and that his statements were not the product of coercion or undue influence by the police.

**{¶ 24}** The first assignment of error is overruled.

### III.    Sufficiency

**{¶ 25}** The second assignment of error asserted by Pence states:

APPELLANT'S CONVICTION FOR AGGRAVATED MURDER (PRIOR CALCULATION DESIGN) IS BASED UPON INSUFFICIENT EVIDENCE.

**{¶ 26}** Pence argues the State failed to adduce evidence sufficient to support his conviction for aggravated murder.

**{¶ 27}** "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160 ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The relevant inquiry is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the crime's essential elements proven beyond a reasonable doubt. *Id.*

{¶ 28} Pence was convicted of aggravated murder in violation of R.C. 2903.01(A), which states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "A person acts purposefully when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 29} "Evidence of purpose, however, does not automatically mean that the element of prior calculation and design also exists." *State v. Walker*, 2016-Ohio-8295, ¶ 17. As explained by the Supreme Court of Ohio:

The phrase "prior calculation and design" by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death. The General Assembly has determined that it is a greater offense to premeditate or to plan ahead to purposely kill someone. All prior-calculation-and-design offenses will

necessarily include purposeful homicides; not all purposeful homicides have an element of prior calculation and design.

Since the enactment of R.C. 2903.01 in 1974, we have repeatedly emphasized that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial."

We traditionally consider three factors in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' "

(Citations omitted.) *Id.* at ¶ 18-20.

{¶ 30} On this record, there was evidence upon which a rational trier fact could have relied in determining that Pence and the victim had been in a relationship and that the relationship had become strained. This evidence included testimony from the victim's family as well as the information gleaned from both interviews conducted by Det. Hogue. Further, Pence used the victim's name when he informed Hunter Dice that he "felt the need to harm someone"; Pence claimed that this person had been harassing Pence's family.

{¶ 31} The evidence demonstrated that, after Pence left Dice's home, he went to a gas station to purchase a knife. He then went to the victim's home and surreptitiously

entered through an unlocked door. Based upon this evidence, a reasonable juror could have inferred that Pence gave thought to both the murder weapon and the place to commit the offense.

{¶ 32} Finally, the evidence established that the act of murder was not an instantaneous eruption of events. As noted, Pence mentioned harming the victim while at his friend's home. He then went to a store, purchased a knife, snuck into the victim's home, hid in a back area, and waited for the victim to fall asleep. When the victim fell asleep, Pence stabbed him 21 times.

{¶ 33} Based upon the record before us, we conclude that the State presented sufficient evidence to support a finding that Pence had planned ahead with the intent to purposefully kill the victim. In other words, the State presented evidence upon which the jury could have reasonably concluded that Pence acted with prior calculation and design.

{¶ 34} The second assignment of error is overruled.


### IV.    Manifest Weight

{¶ 35} Pence's third assignment of error states:

APPELLANT'S CONVICTIONS FOR AGGRAVATED BURGLARY, AGGRAVATED MURDER (PRIOR CALCULATION DESIGN), AND TAMPERING WITH EVIDENCE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} Pence asserts that his convictions were not supported by the weight of the evidence. In support, he argues that he established that he was not sane at the time he

committed the offenses. Thus, he contends the jury lost its way in convicting him of the offenses rather than finding him not guilty by reason of insanity.

{¶ 37} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 38} The jury, as the finder of fact, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Turner*, 2024-Ohio-2196, ¶ 14 (2d Dist.) This is so because the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Thus, a reviewing court must give great deference to the jury's determination of witness credibility. *State v. Yarbrough*, 2010-Ohio-5882, ¶ 11 (2d Dist.). We cannot conclude that a conviction is against the manifest weight of the evidence simply because the jury believes the State's evidence over that of the defendant. *State v. Houston*, 2005-Ohio-4249, ¶ 38 (10th Dist.), *rev'd and remanded in part on other grounds by In re Ohio Criminal Sentencing Statutes Cases,* 109 Ohio St.3d 313 (2006); *State v. Campbell*, 2024-Ohio-

1693, ¶ 32 (8th Dist.).

**{¶ 39}** As noted, Pence's sanity was evaluated on three separate occasions by three different psychologists.   Both the initial evaluator and the State's expert opined that Pence had been able to appreciate the wrongfulness of his actions and that he had been sane at the time he committed the offenses.   Although Pence's expert opined that he was legally insane at the time of the offenses, the State's expert provided testimony upon which the jury could have relied in deciding not to credit Pence's expert.   Specifically, the State's expert explained that the tests used by the defense expert were not relevant to the issue of sanity.   She further noted that Pence stated that he knew his actions were wrong and that Pence's actions in disposing of the incriminating evidence, specifically the knife and his bloody clothing, were indicative of someone who was able to appreciate the wrongfulness of his actions.

**{¶ 40}** Based upon the record before us, we cannot say this is a case where the jury lost its way in convicting Pence.   Accordingly, the third assignment of error is overruled.

### V.    Sanity Evaluation

**{¶ 41}** Pence's fourth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING APPELLEE'S REQUEST FOR A THIRD EVALUATION OF APPELLANT'S SANITY AT THE TIME OF THE ALLEGED OFFENSE.

**{¶ 42}** Pence claims the trial court abused its discretion by granting the State's

motion to have Pence's sanity evaluated by an expert of the State's choosing. In support, he argues there is no statutory mandate for ordering "a third opinion when the first two opinions are split on the issue of insanity." He claims that, by permitting a third evaluation, the court "tilted the case in favor of the prosecution."

{¶ 43} R.C. 2945.371, which governs sanity evaluations, states:

A) If the issue of a defendant's competence to stand trial is raised or if a defendant enters a plea of not guilty by reason of insanity, the court may order one or more evaluations of the defendant's present mental condition or, in the case of a plea of not guilty by reason of insanity, of the defendant's mental condition at the time of the offense charged. An examiner shall conduct the evaluation and the evaluation may be conducted through electronic means.

(B) If the court orders more than one evaluation under division (A) of this section, the prosecutor and the defendant may recommend to the court an examiner whom each prefers to perform one of the evaluations. If a defendant enters a plea of not guilty by reason of insanity and if the court does not designate an examiner recommended by the defendant, the court shall inform the defendant that the defendant may have independent expert evaluation and that, if the defendant is unable to obtain independent expert evaluation, it will be obtained for the defendant at public expense if the defendant is indigent.

{¶ 44} The language utilized in the statute indicates that the decision whether to

order a sanity evaluation is a matter left to the discretion of the court. *State v. McCoy*, 2024-Ohio-98, ¶ 11. Indeed, the language of subsection (A) indicates that the trial court has the discretion not to order an evaluation, to order one evaluation, or to order more than one evaluation. Further, subsection (B) permits both the defendant and the State to recommend evaluators that they prefer to use. Thus, reading subsection (B) in conjunction with subsection (A) supports a conclusion that the court may order an evaluation by an expert designated by the court, an expert recommended by the defendant, and an expert recommended by the State, as occurred here.

{¶ 45} The fourth assignment of error is overruled.

## VI. Effective Assistance of Counsel

{¶ 46} The fifth assignment of error states:

APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE UNITED STATES AND OHIO CONSTITUTION.

{¶ 47} Pence contends that trial counsel failed to provide effective assistance during this case.

{¶ 48} We review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989). To prevail on a claim of ineffective assistance, a defendant must show that trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him.

*Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus.

**{¶ 49}** To establish deficient performance, a defendant must show that trial counsel's performance fell below an objective standard of reasonable representation. *Strickland* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.).

**{¶ 50}** To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

**{¶ 51}** "Trial counsel is allowed wide latitude in formulating trial strategy[.]" *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.). Therefore, when reviewing ineffective assistance claims, we must not second-guess trial strategy decisions. *Strickland* at 689. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525.

**{¶ 52}** Pence first claims that trial counsel's representation was deficient because

he failed to object to the State's request for a third sanity evaluation. Given our resolution of the fourth assignment of error finding no error in the trial court's decision to grant the State's request, we find that counsel was not deficient in failing to object to a third evaluation.

{¶ 53} Next, Pence contends counsel's representation during the suppression hearing was deficient because counsel did not present evidence of the results of the sanity evaluations. We likewise find this argument lacking in merit. Pence admits the trial court was aware of and had access to the mental evaluations. Further, trial counsel made an argument at the conclusion of the hearing regarding Pence's mental illness. Most importantly, the trial court referenced Pence's history of mental illness in its decision.

{¶ 54} Because Pence has failed to demonstrate that counsel's representation during the suppression hearing was deficient, his claim of ineffective assistance of counsel must fail.

{¶ 55} The fifth assignment of error is overruled.


### VII.    Sentencing

{¶ 56} Pence's sixth assignment of error states:

> THE TRIAL COURT ERRED IN OMITTING PAROLE ELIGIBILITY
> IN ITS SENTENCING ENTRY.

{¶ 57} Pence challenges the trial court's sentencing order. Specifically, he claims the trial court erred by stating that the sentence for aggravated murder was "twenty years to life," rather than utilizing the "life imprisonment with parole eligibility after serving twenty

years of imprisonment" language set forth in R.C. 2929.03(A)(1).

{¶ 58} R.C. 2929.03(A)(1)(b) provides that, for a conviction of aggravated murder, "the trial court shall impose" a sentence of "life imprisonment with parole eligibility after serving twenty years of imprisonment[.]" Ohio Adm.Code 5120-2-10(B) provides, in relevant part, as follows:

> A sentence of life imprisonment imposed pursuant to section 2929.03 of the Revised Code for the offense of aggravated murder shall be presumed to be a sentence of life imprisonment with parole eligibility after twenty years, subject to diminution under rules 5120-2-05, 5120-2-06 and 5120-2-07 of the Administrative Code, unless the journal entry of the court specifies that parole eligibility is to be after twenty full years or thirty full years.

{¶ 59} The plain language of Ohio Adm.Code 5120-2-10(B) provides that Pence's parole eligibility on the aggravated murder charge is presumed under the law. *State v. Perry*, 2017-Ohio-1515, ¶ 23 (11th Dist.); *State v. Brown*, 2014-Ohio-5832, ¶ 36 (7th Dist.). Therefore, even though the sentencing entry did not expressly state that Pence would become eligible for parole on his aggravated murder conviction after serving 20 years in prison, such eligibility is presumed because the sentencing entry did not indicate otherwise.

{¶ 60} The sixth assignment of error is without merit and, accordingly, is overruled.

## VIII. Conclusion

{¶ 61} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.