[Cite as *State v. Norris*, 2025-Ohio-1976.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 24CA1 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| MELISSA R. NORRIS, | : | |
| Defendant-Appellant. | : | **RELEASED 5/29/2025** |

_____

APPEARANCES:

Joel M. Spitzer, Spitzer Law Offices LLC, Marion, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, Adam J. King, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.

_____

Hess, J.

**{¶1}** Melissa R. Norris appeals her murder conviction following a jury trial. The charges stem from an altercation between Norris and the victim, her former brother-in-law, in which Norris shot and killed the victim in his home. Norris contends that her murder conviction lacked sufficient evidence and was against the manifest weight of the evidence because she was acting in self-defense when she shot the victim. However, because self-defense is not an element of the crime of murder that the State must disprove, we do not review the State's proof of the absence of self-defense under a "sufficiency of the evidence" framework. Instead, it is reviewed under the "manifest weight of the evidence" framework. And, after our review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly

lost its way so as to create a manifest miscarriage of justice such that Norris's convictions must be reversed and a new trial ordered.

{¶2} Norris also contends that she received ineffective assistance of counsel because her trial counsel did not seek a second opinion regarding her competency to stand trial and did not object to the admission of her recorded jail call in which she and a relative engaged in a discussion by which Norris would assert self-defense. However, Norris did not establish that her trial counsel was deficient, and she did not argue or show that she was prejudiced by any of the alleged deficiencies, so her claim fails.

{¶3} Finally, Norris contends that the jury verdict was inconsistent and requires a new trial. Norris was found guilty of murder, but not guilty of felonious assault. However, Norris fails to explain how the two verdicts are inconsistent. The State argued that she used a baseball bat to commit felonious assault against the victim and then, after she and the victim struggled and he managed to take the bat away from her, Norris grabbed a nearby shotgun and shot and killed the victim. Because there were two different crimes using two different weapons, it was not inconsistent for the jury to find that the State failed to prove beyond a reasonable doubt she committed felonious assault with the baseball bat and still find her guilty of murder using the shotgun.

{¶4} We overrule Norris's assignments of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶5} The Highland County grand jury indicted Norris on one count of murder in violation of R.C. 2903.02(A), with a firearm specification; one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony; and one count of tampering

with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. Prior to trial, the State dismissed the tampering charge. Norris pleaded not guilty and her attorney filed a motion for a psychiatric evaluation to assess her competency to stand trial. The trial court ordered an evaluation of Norris's mental condition, held a competency hearing, and found her competent. Shortly thereafter, Norris filed a notice of intent to argue self-defense.

{¶6}    At trial, the victim's son, Kyle Norris, testified that he knew Melissa Norris because she had been married to Kyle's uncle, the victim's brother. Kyle testified that his father was 53 years old when he died. Kyle was staying with his father in March 2023 because he was helping take care of him following back surgery. Kyle testified that his father had several medical issues, including heart problems, and had recently had back surgery in January 2023 due to an accelerated degenerative disc disease. Kyle identified a number of medications that his father was taking daily to help with pain and nausea. Kyle testified that his father slept in a recliner in the living room because of the back and neck problems he suffered. Kyle's father's muscles had atrophied and he weighed approximately 136 pounds at the time of his death. Kyle testified that he left his father's apartment the morning of March 10, 2023 to go to work. His father kept a baseball bat and a shotgun within reach of his recliner and his father was wearing a Cincinnati Reds t-shirt that morning when Kyle left.  Kyle listened to a recording of the 9-1-1 call and identified his father and Melissa Norris as the two voices on the call. Kyle also identified his father's phone number.

{¶7}    Halley Pollard testified that she is a felon residing in a rehabilitation facility in Ross County, Ohio. Pollard testified that Melissa Norris is her mother. On March 11, 2023, Pollard went to the victim's house to ask him for a ride and her mother answered

the door. The victim was asleep in the recliner, which was positioned next to the sliding glass door. Pollard testified that after the victim woke up, she and the victim were "chitchatting" and at some point she asked him about his Reds t-shirt and they discussed how Pollard's brother also had the same shirt. Pollard testified that, at that point, her mother, Melissa Norris, started yelling at the victim and accused him of stealing the shirt from her son. Pollard testified that her mother got up, went to the kitchen for a cup of coffee, and then came back in and grabbed the baseball bat that was in the corner. The victim stood up and he and Melissa Norris began arguing back and forth and tugging the baseball bat back and forth. The victim then instructed Pollard "to call the law," but Pollard testified that she refused because she had an outstanding warrant. Pollard identified the two voices on the 9-1-1 call as that of the victim and Melissa Norris. Pollard testified that the victim was the voice asking for help. The only people left in the apartment when Pollard left were the victim and Melissa Norris. Pollard testified that Norris picked up the baseball bat and held it, "Like, say if you're going to hit a ball." Her mother did not have time to swing it at the victim because he stood up and was able to grab it. After the victim asked Pollard to call 9-1-1, Pollard immediately left the apartment while they were still struggling over the bat. Pollard testified that she did not see any marks on Melissa Norris's face before Pollard left the apartment.

{¶8} The 9-1-1 dispatcher testified that he received the 9-1-1 call at approximately 2:32 pm on March 11, 2023. He identified that the phone that called 9-1-1 was the same number that Kyle Norris identified as his father's phone number. A forensic pathologist testified that he performed an autopsy on the victim and determined that the cause of death was a gunshot wound to the left side of the neck and face. Death would

have occurred within seconds, or at the most minutes, after the shot. A DNA expert testified that blood splatters on Melissa Norris's clothing were from the victim. An expert in computer forensics testified that he received and analyzed the cell phone and determined that the phone number matched the number that placed the 9-1-1 call. A firearms and ammunition expert testified that the gauge of the shotgun shell recovered was commonly used with the shotgun found at the scene.

{¶9}    Hillsboro Police Officer Brian Butler testified that he responded to the 9-1-1 call. Brian Lamb, a resident at the apartment building, told Officer Butler and his partner that they should check the apartment immediately below his apartment. Officer Butler and his partner went downstairs. After they knocked and got no answer, they went into the apartment and found Melissa Norris with blood on her, carrying a cell phone and a coffee cup. Officer Butler also found a shotgun wrapped in a flannel shirt in the middle of the living room area and a deceased male lying sideways in a chair with a gunshot wound to the face. Officer Butler identified the cell phone he took from Melissa Norris. He also obtained the clothing Norris was wearing. Officer Butler noticed an abrasion on Norris's face, near her eye. He asked her about it and she told him that it was not an injury she received that day. Officer Butler testified about the photographs he took of the interior of the apartment and the victim's gunshot wound.

{¶10} Officer Butler testified that at no time during his interactions with Melissa Norris did she inform him that she was in fear for her life from the victim or that she and he had been arguing. Officer Butler received a letter from Halley Pollard a few days later in which Pollard admitted that she had been in the apartment prior to the shooting and that Melissa Norris started arguing with the victim about his shirt. Pollard's letter explained

that Norris grabbed a baseball bat and went after the victim and the victim grabbed it from her. At that point, Officer Butler went back to the apartment and retrieved the baseball bat, which was propped up against the wall between two chairs in the living room. The 9-1-1 call was played for Officer Butler who testified that the voice of Melissa Norris states, "You don't think I'll do it?" and then the victim states, "I need to get somebody here. I got a gun pulled on me in my own apartment." Officer Butler testified that while the call is transferred to the police department there is the sound of the gunshot. Officer Bulter also heard someone refer to "clearing something" which he explained, "When you clear a gun, make it safe. That is universally well-known with experienced gun owners." He testified that the statement was significant in this case because there was a shell lodged in the chamber of the gun.

{¶11} Officer Butler testified that when he first saw Melissa Norris she appeared to have something wet that smelled like coffee on her back. Norris was breathing heavily and was nonverbal, with an abrasion over her right eye and a small cut under the right eye. Officer Butler called an ambulance because she appeared to be in shock.

{¶12} Brian Lamb testified that he was at the victim's apartment building in his wife's apartment above the victim's apartment. When he arrived at the apartment building, Lamb saw a younger woman sitting outside the victim's door. He walked past her and up to his wife's apartment. A little while later, Lamb heard yelling about someone lying and then a scuffle and things being knocked over. Lamb heard a woman's voice say, "get the F-word off of me." Lamb testified that he heard a door slam and it get quiet and "then I heard a boom" and then later a policeman's radio out in the hallway. The police were in

the hallway and asked Lamb if he had heard anything and Lamb indicated that the sounds were from the apartment immediately below him.

**{¶13}** Melissa Norris testified that the victim was her ex-brother-in-law that she had known for 25 years. She was staying at his apartment March 9 through March 11, 2023. The victim was sleeping in one of the recliners in the living room and Norris was sleeping in the other recliner. Norris got up the morning of March 11, 2023 and took a shower. Following her shower, she heard a knock on the door. Her daughter, Halley Pollard, was at the door. Shortly after Pollard arrived, the victim woke up and went into the kitchen and made coffee. Norris testified that she asked the victim if the shirt he was wearing was Norris's son's shirt and the victim became "aggressive, angry" and told Norris that it was his shirt. Then Norris grabbed the baseball bat and asked the victim whether the baseball bat was her son's bat. Norris testified, "I went to reach for it, and he lunged toward me and when he lunged at me, it - - there was a bat sitting - - standing against the wall and there was a gun. And when I reached for the gun, where he lunged at me, it knocked my hand into the gun. So I was setting it back up. As I sat it back up, he snatched it out of my hand." Norris agreed that her daughter had testified that there was a struggle over the bat, but Norris denied that they had struggled or that she had tried to hit the victim. Instead, Norris testified that after she set up the gun back against the wall, the victim grabbed the gun.

Q:     After he grabbed the gun, what did you do?

A:     I was like - - it scared me, the way he was - - cause he was aggressive about it, it just - - it scared me, and I thought I'm - - I'm getting the hell out of here. So - -

Q:     So you indicated, you said, you're getting - - you know is this in your mind, I'm leaving?

A:      Yes.

Q:      Okay. Why were you wanting to leave the apartment?

A:      Because the way he was aggressive with - - about the t-shirt, you know, making a big deal out of it. And then when - - over the bat and then hitting the gun and the way he grabbed at [sic] out of my hand, I - - it scared me.  Just - - it scared me.

Q:      Okay. So what did you do?

A:      I ran for the door.

Q:      Okay. So how far away from where you were standing, if you recall, was the door?

A:      Me to your table.

    * * *

Q:      But would you say ten to twelve feet?

A:      Yeah.

    * * *

Q:      And so, when you made a B-line [sic] to the door, were you able to leave?

A:      No.

Q:      Why were you not able to leave?

A:      Cause he was standing in front of the door with the gun. He met me there. It's like he met me there at the same time like he was stopping me and he cut me off.

Q:       So please describe that for me. So, you go to the door?

A:      I'm going for the door.

Q:      Okay. And where was [the victim]?

A:      [The victim] was coming around the living room side and as he come around the living room side, he met me at the door and was standing there with the gun. And all - - and he just - - he throwed the gun and just grabbed me.

Q:      So when you were at the door, what happened?

A:      When I get to the door and he - - he had that gun, I seen him throw it and then he grabbed ahold of me and slammed me to the ground, bashing my head on the floor. It was - - it was - - I don't - - it was - - it was bad.

Q:       Okay. So you indicate [the victim] took you to the ground?

A:      Yes.

{¶14} Norris testified that she received an injury to her right eye when she was forced to the ground. Norris did not know how long their fight continued, but eventually it ended:

A:      It was like we started scuffling and I ended up in the living room. And I don't recall like - - he just - - I don't know, I was fighting him. I remember being combative. I remember scratching, hitting, you know, fighting him back and the next thing I know, he's getting off. I'm cussing him. I'm hollering at him. I told him I – I said, "I'm calling the law," is what I said, and that's when he got up off me.

Q:      And at any point, did you grab the gun?

A:      Yes.

Q:      Why did you grab the gun, Melissa?

A:      Because I was scared he was coming back at me again.

Q:      Okay. Where were you at when you grabbed the gun.

A:      In the living room.

Q:      Okay. And where was [the victim]?

A:      Coming around the corner, coming towards me.

Q:      Okay. Melissa, did you shoot [the victim]?

A:      Yes.

Q:      Okay. Why did you shoot [the victim], Melissa?

A:      Cause I was scared, scared to death.

{¶15} Norris testified that she stayed in the apartment after she shot the victim because she was in shock and had been "pretty banged up."

{¶16} On cross-examination, Melissa Norris testified that her ex-husband, Jerry Norris, took her over to his brother's house because Melissa needed a place to stay. Norris testified that the first night she was there, March 9, 2023, she, Kyle Norris, and the victim all stayed in the apartment. On March 10, only she and the victim stayed at the apartment. Then, the following day at approximately noon on March 11, Norris's daughter Halley Pollard came to the apartment. Norris acknowledged that the victim had had medical issues and had a walker sitting next to his recliner. Norris testified that she was not aware that the victim had had neck and back surgery two months before the incident. She knew he was thin but was not aware that the victim weighed 134 pounds when she shot him.

{¶17} Norris denied that she became convinced and enraged that the victim was wearing her son's Reds t-shirt. Norris also denied picking up the baseball bat. Norris testified that her daughter was lying when she testified that Norris grabbed the baseball bat. Norris also testified that she did not know whether there was anyone else in the apartment during the incident even though she had been staying there for three days, but to the best of her knowledge, it was only her and the victim. Norris admitted that the voice on the 9-1-1 recording sounded like her voice saying, "You don't think I'll do it do you?" and that it sounded like the victim's voice said, "I've had a gun pulled on me in my own apartment." After the gunshot is heard on the 9-1-1 call, a voice says, "How do you clear this thing?" Even though there were only two people in the apartment during the 9-1-1 call and the victim had been shot in the face, Norris was unable to identify the voice that

stated, "How do you clear this thing?" and denied it was her own voice. Norris admitted that at no point during the 9-1-1 call was she seeking help.

{¶18} Norris was also unable to testify with any certainty where the victim was when she shot him. The victim's body was lying in the recliner, but Norris testified that it was possible that the victim was standing in front of the recliner and fell into it when she shot him. Norris testified that she did not move the victim's body or pick it up and place it in the recliner after she shot him. Norris testified that the victim was "coming at me - - when he come at me, he was in front of that chair, yes." Norris acknowledged that there were several exits from the apartment, but she was not able to use any of them to escape the situation "because I was just laying on the floor - - assaulted, fearing for my life."

{¶19} Norris testified that law enforcement arrived after the 9-1-1 call was placed, but she denied that she repeatedly told law enforcement that she was not hurt. Norris testified that she was not clear because it was foggy and then admitted that she might have told law enforcement she was not hurt. Norris testified that she did not tell law enforcement that she had been in a fight with the victim.

{¶20} Norris testified that about eight months after the incident, on November 10, 2023, while she was incarcerated, she told a cousin on a jail telephone call that she shot the victim in self-defense and that this was the first time she claimed she was acting in self-defense. Norris denied that it was her cousin's idea to claim self-defense. However, the State played the recording of the jail call between Norris and her cousin and then asked her about it, explaining that up until November 2023, Norris never asserted she acted in self-defense until the phone call with her cousin:

Q: He told you right there, this was self-defense.

A:      He given me his opinion.

Q:      And then you - - and you grabbed onto that and said, yeah, that's exactly what happened?

A:      No

Q:      We just heard you.

A:      I might have agreed with him maybe?

**{¶21}** Norris also denied that she had several other jail telephone calls prior to the November 10, 2023 call in which she claimed that she was being framed. Norris admitted that the victim did not have a weapon on him when she shot him.

**{¶22}** The jury found Norris guilty of murder and found in favor of the gun specification, but not guilty of felonious assault. The trial court sentenced her to 15 years to life for murder, plus a mandatory 3 years on the gun specification for a total prison term of 18 years to life. Norris appealed.

## II.  ASSIGNMENTS OF ERROR

**{¶23}** Norris presents the following assignments of error:

I.      The trial court abused its discretion when it entered a judgment against the appellant when the judgment was not supported by the manifest weight of the evidence.

II.     The trial court erred when it failed to grant the defen[d]ant's motion for acquittal as the guilty verdict at the trial court was not supported by sufficient evidence.

III.    Appellant received ineffective assistance of counsel to a degree that [s]he did not receive a fair trial.

IV.     The trial verdicts of guilty for murder but not guilty for felonious assault are inconsistent.

## III.  LAW AND ANALYSIS

### A. Sufficiency of the Evidence and Manifest Weight of the Evidence in the Context of a Claim of Self-Defense

**{¶24}** In her first and second assignments of error, Norris contends that her conviction was not supported by sufficient evidence and was against the manifest weight of the evidence because she believes the State failed to establish sufficient evidence that she did not act in self-defense and the manifest weight of the evidence does not support her conviction because there was evidence she acted in self-defense because she felt threatened, had suffered minor facial injuries, and lacked the requisite intent.

### 1. Sufficiency of the Evidence

**{¶25}** Norris argues that the State presented insufficient evidence to sustain her murder conviction. She does not argue that the State failed to produce evidence on all the essential elements of murder as contained in R.C. 2903.02. Instead, she asserts that the State failed to produce sufficient evidence to disprove her claim that she shot the victim in self-defense. However, in *State v. Messenger*, 2022-Ohio-4562, the Supreme Court of Ohio rejected the argument that the State must produce sufficient evidence of the absence of self-defense as an element of every offense involving the use of force. The Court discussed the 2019 amendment to the self-defense statute and found that the change in R.C. 2901.05(B)(1) to the State's burden of persuasion on self-defense did not change the elements of murder. The requirement that "the state must disprove an affirmative defense beyond a reasonable doubt does not in itself cause the affirmative defense to become an element of the offense." *Messenger* at ¶ 24. "Self-defense remains an affirmative defense in Ohio, and an affirmative defense is not an element of a crime[.]" *Id.*

Given the foregoing, a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense. Similarly to the standard for judging the sufficiency of the state's evidence, if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.

. . . . As the Tenth District aptly explained, the sufficiency-of-the-evidence standard of review applies to Messenger's burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion.

(Citations omitted). *State v. Messenger*, 2022-Ohio-4562, ¶ 25-26.

**{¶26}** As in *Messenger*, here the trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded Norris put forward sufficient evidence that she was acting in self-defense when she shot and killed the victim. The jury's guilty verdict here, like the guilty verdict in *Messenger*, means that the State met its burden of persuading the jury beyond a reasonable doubt that Norris was not acting in self-defense. Because the State does not bear the burden of production on self-defense, "sufficiency of the evidence" is not the proper framework to review whether the State proved the absence of self-defense. *State v. Messenger*, 2021-Ohio-2044, ¶ 44 (10th Dist.), *aff'd*, 2022-Ohio-4562. For this reason, we overrule Norris's second assignment of error challenging the sufficiency of the State's evidence to prove the absence of self-defense.

2. Manifest Weight of the Evidence

**{¶27}** Norris's avenue to challenge the State's proof relative to her claim of self-defense is with a challenge to the manifest weight of the evidence. *Messenger,* 2021-

Ohio-2044, ¶ 45. In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56 (1988), syllabus; *State v. Harvey*, 2022-Ohio-2319, ¶ 24 (4th Dist.). However, to prove the absence of self-defense, the State need only present substantial evidence to disprove any one of the elements of self-defense. *State v. Messenger,* 2021-Ohio-2044, ¶ 50 (10th Dist.). Because a trier of fact sees and hears the witnesses, appellate courts will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, ¶ 50-54 (4th Dist.).

### 3. Elements of Self-Defense

{¶28} A claim of self-defense includes the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Messenger*, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

Since H.B. 228 amended R.C. 2901.05, effective March 28, 2019, the burden regarding self-defense set forth in R.C. 2901.05(B)(1) is:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶29} Norris argues that her conviction is against the manifest weight of the evidence because there was evidence to suggest that when the victim stood up from his recliner, Norris could have reasonably felt that she was being threatened because the two had been yelling at one another over the Reds t-shirt. She also contends that the bulk of the evidence against her came from the recording of the 9-1-1 call. Finally, she argues that the evidence of injuries to her face and her state of shock is evidence of lack of intent. She asserts that her testimony demonstrates that she acted in self-defense and the State's evidence of the 9-1-1 call and other witnesses' testimony did not convincingly prove otherwise.

{¶30} The State is only required to disprove one of the elements of self-defense beyond a reasonable doubt to sufficiently disprove a defendant's claim of self-defense. A conviction is not against the manifest weight of the evidence because the trier of fact believed the State's evidence over the defense's evidence. The trier of fact is free to believe all, part, or none of a witness's testimony. *State v. Ervin*, 2018-Ohio-3451, ¶ 15 (4th Dist.).

{¶31} Based on a review of the witnesses' testimony, the photographs of the crime scene, the autopsy report, and the audio recording of the 9-1-1 call, we do not find that

the jury clearly lost its way in concluding the State proved that Norris did not act in self-defense.

**{¶32}** First, the State presented evidence that Norris was at fault in creating the situation giving rise to the affray. Norris's daughter, Halley Pollard, testified that Norris became convinced that the victim had stolen a Cincinnati Reds t-shirt from her son, became highly agitated and angry, grabbed a baseball bat, and threatened the victim. Before Norris could swing it, Pollard testified that the victim managed to take it away from her. Pollard testified that the victim asked her to call law enforcement for assistance – it was not Norris who asked for 9-1-1 assistance. Several witnesses and Norris testified that the recording of the 9-1-1 call had the voices of Norris and the victim. On the recording, Norris's voice is heard calmly saying, "You don't think I'll do it do you?" and the victim's voice telling the dispatcher, "I've had a gun pulled on me in my own apartment." Shortly after that, a gunshot is heard and a female voice commenting about clearing the gun. Thus, the testimony from Pollard directly contradicts Norris's testimony and, more critically, the evidence from the 9-1-1 call directly contradicts Norris's testimony about the events immediately prior to the gunshot, when Pollard was no longer in the apartment. This evidence shows that Norris was at fault for creating the situation that led to the affray and that she was not acting in self-defense when she shot the victim.

**{¶33}** Norris argues that there was evidence to suggest that when the victim stood up from his recliner, Norris could have reasonably felt she was being threatened because the two were yelling at each other. Norris also argues that there was evidence that the injuries to her face resulted from the struggle she had with the victim. However, the fact that Norris may have felt threatened because the two were yelling or that she had an

abrasion from a scuffle does not establish that she was not at fault for creating the situation. Pollard testified that Norris started the fight and the two began arguing after Norris accused the victim of stealing the Reds t-shirt from her son. Law enforcement who arrived at the scene within minutes of the shooting testified that Norris informed them at that time that she was not injured, and she did not tell them she had shot the victim in self-defense or that any struggle had occurred at all between the two of them. Norris agreed that it was not until after her jail phone call with her cousin in November 2023, eight months after the shooting, that she began to assert a claim of self-defense.

{¶34} Second, the State presented credible evidence that a reasonable person, under the same circumstances and with the same subjective beliefs and faculties, would not have a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force. Even if we believed Norris's testimony that she grabbed the shotgun and shot the victim only after the victim voluntarily tossed the shotgun to the floor, Norris was within several feet of two doors from which she could have exited the apartment. Norris admitted that the victim was unarmed when she aimed the gun at him and shot him. After the victim placed the 9-1-1 call and Norris had the gun trained on him, she could have exited the apartment. Instead, she calmly told the victim, "You don't think I'll do it do you?" and then shot him in the face. There was also evidence that the victim was recovering from a recent neck and back surgery, was taking numerous medications, was receiving assistive care from his son, had a walker next to his recliner, was atrophied, and weighed only 134 pounds at his death. The State produced evidence that Norris did not need to use deadly force against the victim. She

could have turned with the shotgun and exited the apartment to escape whatever imminent danger she perceived.

**{¶35}** After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that, in resolving conflicts in the evidence, the trier of fact did not clearly lose its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. The State introduced evidence to show that (1) Norris was at fault for creating the situation that led to the affray and (2) under the same circumstances a reasonable person could not have believed that she was in imminent danger of death or great bodily harm and her only way of escape was the use of deadly force. We overrule Norris's first assignment of error.

### B. Ineffective Assistance of Counsel

**{¶36}** For her third assignment of error, Norris contends that her trial counsel was ineffective (1) for failing to obtain a second opinion regarding her competency and (2) for failing to object to the admission of the recorded jail call between her and a relative concerning the potential self-defense claim.

### 1. Standard of Review

**{¶37}** To prevail on an ineffective assistance claim, a defendant must show: "(1) that his counsel's performance fell below an objective standard of reasonableness and (2) that his counsel's deficient performance prejudiced him resulting in a fundamentally unfair or unreliable outcome of the proceeding." *State v. Wilson*, 2024-Ohio-776, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent."

*State v. Gondor,* 2006-Ohio-6679, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, (1955); *State v. Bailey*, 2023-Ohio-2919, ¶ 10 (4th Dist.).

### 2. Legal Analysis

**{¶38}** Norris's counsel requested a competency evaluation, the trial court ordered one, and the court found Norris competent following a hearing. Norris fails to explain why a second competency evaluation was necessary. She cites nothing in the record that indicates that a second competency evaluation would have resulted in a finding of incompetency and the record contains insufficient indicia of incompetence to require a second competency evaluation or a competency hearing. Where there is no indication that a second examination would reveal a different conclusion, "a defendant is hard-pressed to establish ineffective assistance of counsel for failing to request a second exam." *In re S.M.*, 2009-Ohio-3118, ¶ 12-13 (4th Dist.), citing *State v. Womack,* 2005–Ohio–2689, ¶ 21 (6th Dist.).

**{¶39}** As to her second argument, Norris fails to identify the basis for an objection to the jail call. The decision to admit or exclude evidence rests within the trial court's sound discretion. *State v. McGuire*, 80 Ohio St.3d 390, 400–401 (1997). Thus, a reviewing court will not reverse the trial court's decision absent an abuse of discretion. *State v. Tyler*, 2011-Ohio-3937, ¶ 24 (4th Dist.). A recording of a jail call is admissible if it is authentic, accurate, and trustworthy. *Tyler* at ¶ 26, citing *State v. Were*, 2008-Ohio-2762, ¶ 109;

*State v. Powell*, 2023-Ohio-2770, ¶ 44 (8th Dist.) ("statements made by a defendant in a jail call may qualify as an admission of a party opponent under Evid.R. 801(D)(2)(a)"). Because Norris does not state why the jail call was objectionable, she fails to establish that her trial counsel was deficient for failing to raise an objection.

**{¶40}** Norris also fails to carry her burden on the issue of prejudice as to either of the two alleged deficiencies by her trial counsel. We have repeatedly recognized that speculation is insufficient to demonstrate the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Adams*, 2016-Ohio-7772, ¶ 91 (4th Dist.). She does not allege any specific prejudice she experienced because of counsel's alleged ineffectiveness, contending merely that she "did not receive a fair trial." Norris's argument is conclusory; she has not even attempted to show prejudice. *State v. Montgomery*, 2016-Ohio-5487, ¶ 95.

**{¶41}** We overrule Norris's third assignment of error.

### A. Inconsistent Verdicts

**{¶42}** For her fourth assignment of error, Norris contends that the guilty verdict for murder and the not guilty verdict for felonious assault were inconsistent and rendered the jury verdict invalid. She argues that she was "charged with multiple offenses arising out of the same transaction" and that the mixed verdict "suggests a fundamental flaw in the jury's deliberation process."

**{¶43}** Norris's contention is without merit because the two verdicts are not inconsistent. The murder count charged Norris with murder using a firearm. The felonious assault count charged Norris with causing or attempting to cause physical harm to the victim "by means of a deadly weapon or dangerous ordnance, to wit: a baseball bat."

There is nothing inconsistent with the jury's verdict that Norris was guilty of murder with a firearm, but not guilty of a separate felonious assault offense with a baseball bat. They are two separate counts using two different weapons and are not interdependent. "The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440 (1997), paragraph one of the syllabus; *State v. Donohue,* 2018-Ohio-4819, ¶ 19 (4th Dist.) ("for a verdict to be inconsistent, generally inconsistent responses must relate to the same count, not inconsistent responses to different counts of a multiple count indictment").

**{¶44}** We overrule Norris's fourth assignment of error.

## V.  CONCLUSION

**{¶54}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**