[Cite as *State v. Stiggers*, 2026-Ohio-2359.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2025-07-059 |
| Appellee, | : | |
| | | <u>OPINION AND</u> |
| vs. | : | <u>JUDGMENT ENTRY</u> |
| | | 6/22/2026 |
| EUGENE LAVAR STIGGERS, JR., | : | |
| Appellant. | : | |
| | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 24CR42087


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Anthony F. Comunale, for appellant.


## O P I N I O N


**HENDRICKSON, J.**

{¶ 1} Appellant, Eugene Lavar Stiggers, Jr., appeals from his conviction in the

Warren County Court of Common Pleas for felonious assault. For the reasons set forth

below, we affirm his conviction.

{¶ 2} On October 14, 2024, appellant, an inmate at Warren Correctional Institution (WCI), was indicted on one count of attempted murder in violation of R.C. 2923.02(A) and 2923.02, a felony of the first degree, and one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree. The charges arose out of allegations that appellant assaulted and attempted to murder his cellmate, Austin Wray, on January 2, 2024.

{¶ 3} Appellant pled not guilty to the charges. In November 2024, defense counsel moved to have appellant's competency evaluated and for an evaluation to determine the availability of a plea of not guilty by reason of insanity ("NGRI"). In his motion for the evaluations, defense counsel noted that appellant had previously been diagnosed with mental health conditions, including schizophrenia and bipolar disorder, which "may have precluded his ability to grasp the nature and extent of his actions at the time of the alleged offenses." The trial court granted counsel's motion and appellant underwent the evaluations.

{¶ 4} At a hearing on January 7, 2025, defense counsel stipulated to competency and NGRI reports produced by Dr. Robert Kurzhals, Ph.D. In the competency report, Dr. Kurzhals opined that appellant was "presently capable of understanding the adversarial nature and objective of the proceedings pending against him, and he is presently able to assist counsel in preparing a defense for himself. I therefore recommend that he be found Competent to Stand Trial." As for the results of the NGRI evaluation conducted to determine appellant's mental condition at the time the charged offenses were committed, Dr. Kurzhals' report indicated that appellant had not been suffering from an intellectual developmental disorder at the time of the offenses and there had been no indications of severe cognitive impairment. Dr. Kurzhals further indicated that "all the available

- 2 -

information suggests [appellant] was voluntarily under the influence of substances at the time and does not suggest he was actively psychotic. It is also my opinion that [appellant] would have known the wrongfulness of his actions." Therefore, in Dr. Kurzhals' professional opinion, appellant "does not meet the criteria for the Not Guilty by Reason of Insanity Defense." After accepting the reports into evidence, the trial court found appellant competent to stand trial. Defense counsel requested, and the trial court ordered, a second NGRI evaluation of appellant.

{¶ 5} On March 5, 2025, a hearing was held to address the second NGRI evaluation. At that time, appellant stipulated to the report of Dr. Jennifer O'Donnell, Psy.D. In her report, Dr. O'Donnell opined that appellant had been "voluntarily intoxicated at the time of the charged offenses, was not experiencing the symptoms of mental illness, and did not have an intellectual disability." Her evaluation of appellant further led her to believe that appellant "knew the wrongfulness of [his] actions at the time of the charged offenses." As a result of Dr. Kurzhals' and Dr. O'Donnell's reports indicating appellant did not meet the criteria for an NGRI defense, appellant never entered a plea of not guilty by reason of insanity.

{¶ 6} A two-day jury trial commenced on July 10, 2025. At that time, the State presented testimony from two WCI corrections officers who found Wray injured in the cell he shared with appellant, a registered nurse, a doctor, and a paramedic who all provided care and life-saving treatment to Wray, and an Ohio State Highway Patrol trooper who investigated the incident and interviewed appellant about the assault. The State also introduced, and the trial court accepted into evidence, security footage of the outside of Wray's and appellant's cell, body camera footage from the corrections officers who responded after the assault, appellant's recorded interview with law enforcement, medical records pertaining to Wray's injuries, photographs of the cell where the incident took

place, photographs of Wray's injuries, and photographs of appellant and the clothing he was wearing at the time of the attack. The defense did not call any witnesses or offer any exhibits into evidence. From the testimony and evidence presented, the following facts were established.

{¶ 7}    On January 2, 2024, appellant and Wray were cellmates at WCI. They had only been cellmates for a day when an altercation occurred in their cell. At 4:28:54 p.m., appellant began alerting corrections officers of a "medical emergency" in the cell. Prior to that time, there had been no indication of a problem in Wray's and appellant's shared cell. A corrections officer had walked past the cell at 4:19 p.m. and had not alerted on any problems in the cell. Security footage obtained from WCI showed Wray and appellant appearing in the window to their locked cell door periodically. Wray was seen uninjured in the window at 4:21:10 p.m., 4:21:45 p.m., 4:22:32 p.m., and 4:27.45 p.m. A little more than a minute after Wray was last seen uninjured in the cell, appellant called out to say that there was a medical emergency in the cell.

{¶ 8}    Corrections officers who responded to the cell found appellant staring coldly out the cell window. Wray was face down on the floor of the cell in a pool of blood. Wray was unconscious and was gurgling on his own blood. On-site medical staff were immediately called to respond to the cell.

{¶ 9}    Corrections officers placed appellant in restraints and removed him from the cell. The corrections officer who escorted appellant to another locked area testified that appellant told him that "[Wray] fell and hit the sink." Appellant also told the officer that he and Wray had "smoke[d] Tune," which the corrections officer indicated was paper laced with pesticides or insecticides and sometimes laced with drugs like fentanyl or ketamine. The officer explained Tune is prevalent in the prison and inmates inhale or smoke Tune to get a buzz. The doctor who testified at trial, and is also the chief medical officer at WCI,

explained that individuals who use Tune get a "short little buzz" and "usually . . . recuperate in about 20 minutes or so." However, use of Tune can cause disorientation and memory loss.

{¶ 10} Wray's injuries were severe and paramedics were called to the scene to transport him to a nearby hospital. He was subsequently transferred to a hospital in Columbus, Ohio. Wray sustained a subdural hygroma, which is a leak of spinal fluid under the outermost layer surrounding the brain. The doctor who testified at trial explained that such an injury carries a significant risk of death. Wray suffered a traumatic brain injury and brain bleed, which occurs when there is rapid shifting of the brain within the skull with resulting shearing of nerve fibers and blood vessels. The doctor explained that such an injury is caused by a significant amount of force, the type of force usually associated with a motor vehicle accident. Wray also suffered three types of Le Fort fractures to the bones in his face, signifying the front part of his skull had detached from the rest of his skull. The doctor explained that such injuries were commonly seen in head-on, 60-m.p.h. car crashes prior to the installation of air bags. Wray fractured the large, thick bone of his shoulder blade and had multiple fractures to his face, including an orbital floor fracture, fractures to his jaw, and a fracture to the left side of his forehead. He experienced a pseudoaneurysm from a tear in the wall of his carotid artery, had one of his lungs become separated from the sac surrounding it, and had significant bleeding from his sinus cavity due to a severed artery. Wray was in a coma for 23 days.

{¶ 11} Corrections officers, prison medical staff, and Trooper Shuler all observed appellant on January 2, 2024 after the incident. No one from the prison observed any injuries to appellant and appellant did not complain that he was hurt or ask for medical treatment. Trooper Shuler did notice some "redness" on appellant's left hand. The trooper observed that appellant had some "markings" and some "very, very light swelling" around

the knuckle of his middle finger. The clothing and shoes that appellant was wearing was collected into evidence. Blood was observed not only on the bottom of appellant's shoes, but also on the tops and sides of the shoes, on his socks, and spattered on his left pants leg. Inside Wray's and appellant's cell, Trooper Shuler observed large amounts of blood on the floor and blood spray and spatter on the cinderblock wall and toilet.

{¶ 12} Trooper Shuler interviewed appellant on January 2, 2024 at the prison approximately three hours after Wray was injured. The interview was recorded and occurred after appellant was given his *Miranda* rights. Appellant initially told the trooper that Wray stood on the sink in their cell so that he could talk to another inmate through a vent in the ceiling. Appellant claimed Wray fell off the sink and hit his head, thereby causing injury to himself. Trooper Shuler did not believe appellant's account of events and continued questioning him. Appellant changed his story, stating that he and Wray had smoked Tune together and that Wray had demanded that appellant, "pay me what you owe me or I'm going to kick your ass." Appellant stated that he thought Wray would assault him or force him to perform sexual acts as payment for the Tune. Appellant advised Trooper Shuler his mindset was, "[b]efore I let you do something to me, I'm going to try to do something to you." Though Wray had not physically assaulted him, appellant believed Wray was going to do something so he initiated an assault on Wray. Appellant remembered swinging and "knocking [Wray] out." He admitted that he "could have" also stomped on Wray's head during the assault.

{¶ 13} The jury found appellant not guilty of attempted murder but guilty of felonious assault. The trial court proceeded immediately to sentencing. Appellant was sentenced to a minimum of 8 years to a maximum of 12 years in prison.

{¶ 14} Appellant timely appealed his conviction, raising the following as his sole assignment of error:

{¶ 15} APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 16} Appellant argues his trial counsel's performance was deficient in four ways and that he was prejudiced as a result. Specifically, appellant maintains counsel was deficient for failing to (1) file a motion to suppress his statement to Trooper Shuler, (2) request a second competency evaluation, (3) object to the State's introduction of "prior bad acts" evidence at trial, and (4) request a presentence-investigative report ("PSI") or present mitigating evidence at sentencing.

{¶ 17} "To prevail on a claim of ineffective assistance of counsel, a defendant ordinarily must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different."' *State v. Rogers*, 2025-Ohio-4794, ¶ 25, quoting *State v. Mundt*, 2007-Ohio-4836, ¶ 62. *See also Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 694. The failure to satisfy either the deficiency prong or the prejudice prong is fatal to a claim of ineffective assistance of counsel. *State v. Chisenhall*, 2025-Ohio-4893, ¶ 67 (12th Dist.), citing *State v. Madrigal*, 2000-Ohio-448, ¶ 49 (2000).

### Failure to File a Motion to Suppress

{¶ 18} Appellant argues that the statement he made to Trooper Shuler on January 2, 2024, was involuntary and that counsel was deficient for not moving to suppress the statement. Appellant maintains the statement was involuntary as he never executed a written waiver of his *Miranda* rights and, at the time of the custodial interview, he was under the influence of drugs or otherwise unable to voluntarily waive his rights due to his mental health conditions, i.e., schizophrenia and bipolar disorder.

{¶ 19} "The failure to file a motion to suppress is not per se ineffective assistance of counsel." *State v. Fluhart*, 2021-Ohio-3560, ¶ 52 (12th Dist.); *State v. Burson*, 2025-Ohio-499, ¶ 15 (12th Dist.). Rather, "[t]o establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must be able to prove there was a basis for suppression of the evidence in question." *State v. Satterwhite*, 2021-Ohio-2878, ¶ 37 (12th Dist.), citing *State v. Brown*, 2007-Ohio-4837, ¶ 65. "Where a record contains no evidence that would justify the filing of a motion to suppress, [a defendant] has not met the burden of proving that trial counsel violated an essential duty by failing to file the motion." *Fluhart* at ¶ 52. "'[E]ven when there is some evidence in the record to support a motion to suppress, 'an appellate court presumes that defense counsel was effective if defense counsel could reasonably have decided the motion to suppress would have been futile.'" *State v. DeHart*, 2019-Ohio-1048, ¶ 10 (12th Dist.), quoting *State v. Dominguez*, 2012-Ohio-4542, ¶ 20 (12th Dist.).

{¶ 20} A waiver of one's *Miranda* rights "need not be in writing to be valid." *State v. Myers*, 2018-Ohio-1903, ¶ 68, citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "Nor must the accused specifically state that he waives his rights." *Id.*, citing *Butler* at 375-376 and *Treesh v. Bagley*, 612 F.3d 424, 434 (6th Cir. 2010). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). *See also State v. Martin*, 2017-Ohio-7556, ¶ 100-101. In determining whether a statement was made voluntarily or in determining whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination, a court must examine the totality of the circumstances. *State v. Dennis*, 1997-Ohio-372, ¶ 23. Courts should consider "the age, mentality, and prior criminal experience of the accused; the length, intensity, and

frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911 (1978).

{¶ 21} In the present case, appellant cannot demonstrate that his trial counsel was ineffective for electing not to file a motion to suppress. The evidence before us does not establish that such a motion would have been successful if made. Rather, to the contrary, the record indicates appellant made a voluntary statement to Trooper Shuler after being advised of his *Miranda* rights and voluntarily, knowingly, and intelligently waiving such rights.

{¶ 22} Appellant, who was 23 years old at the time of the interview, had prior experience with law enforcement and the criminal justice system. He was serving a sentence at WCI after being convicted of other criminal offenses. The video recording of appellant's interview with Trooper Shuler indicates he knowingly, intelligently, and voluntarily spoke with the trooper *after* verbally being advised of his *Miranda* rights and being presented with a written copy of his *Miranda* rights. That appellant did not sign a written waiver of rights before speaking with the trooper does not make the waiver involuntary as a waiver of rights "need not be in writing to be valid." *Myers*, 2018-Ohio-1903, at ¶ 68. The interview occurred approximately three hours after the incident in the cell and lasted less than 30 minutes in length. There was nothing coercive or overbearing in the manner in which appellant was questioned by law enforcement and the record does not contain any evidence of physical deprivation or mistreatment.

{¶ 23} Appellant argues that he could not have voluntarily waived his *Miranda* rights as his mental health conditions (schizophrenia and bipolar disorder), as well as his earlier use of drugs, negated his capacity to act voluntarily. While a defendant's mental condition may be a "significant factor in the 'voluntariness' calculus," it "does not justify a

conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). *See also State v. Ford*, 2019-Ohio-4539, ¶ 190. The fact that a defendant has been diagnosed with schizophrenia and bipolar disorder does not preclude a defendant from voluntarily waiving his *Miranda* rights. See *State v. Pence*, 2024-Ohio-5121, ¶ 17-23 (2d Dist.) (finding that a defendant with schizophrenia and bipolar disorder diagnoses had voluntarily waived his *Miranda* rights); *State v. Daniels*, 1999 WL 770741, *4-5 (5th Dist. Sept. 20, 1999) (defendant's history of psychiatric problems and diagnoses of paranoia and atypical bipolar disorder did not prevent him from voluntarily waiving his *Miranda* rights). The totality of the circumstances must still be considered.

{¶ 24} The same is true as it relates to the use of drugs or alcohol. The fact that a defendant may have been under the influence of drugs or alcohol, or may have been suffering withdrawal from the use of such substances at the time of the custodial interrogation, is "only one factor that the court considers in its totality-of-the-circumstances analysis." *State v. Wells*, 2017-Ohio-420, ¶ 55 (12th Dist.). *See also State v. Otte*, 1996-Ohio-108, ¶ 34-46 (finding a *Miranda* waiver voluntary under the totality of the circumstances, despite the defendant's claims that he had consumed drugs and alcohol and was in withdrawal at the time of his custodial interview). Further, while "'the presence of drugs or alcohol should be considered . . . the amount must sufficiently impair the confessor's ability to reason.'" *Wells* at ¶ 55, quoting *State v. Standberry*, 2003-Ohio-5700, ¶ 30 (11th Dist.).

{¶ 25} Here, the recorded interview between appellant and Trooper Shuler does not demonstrate or even suggest that appellant lacked the capacity to voluntarily waive his *Miranda* rights. At no point during the interview did appellant appear to be in the midst

of a mental health crisis, intoxicated, unable to function, or otherwise confused about the topic of discussion. Appellant was able to answer Trooper Shuler's questions and participate in the interview in an appropriate manner. If appellant had, in fact, smoked Tune with Wray in their shared cell shortly before the attack, that act was more than three hours removed from the time of the police interview. Medical testimony indicated that Tune only gives an individual a "short little buzz" and the user of the drug recuperates in about 20 minutes. Appellant, therefore, would not have been under the influence of Tune when he was interviewed by Trooper Shuler.

{¶ 26} As the totality of the circumstances before us indicates appellant voluntarily, knowingly, and intelligently waived his *Miranda* rights and that his statement was voluntarily made, we find that trial counsel's decision not to seek suppression of appellant's January 2, 2024 statement to law enforcement did not amount to ineffective assistance of counsel. Trial counsel could have reasonably determined that filing a motion to suppress would have been a futile or frivolous act. *See State v. White*, 2022-Ohio-2182, ¶ 14 (12th Dist.).

**Failure to Request a Second Competency Evaluation**

{¶ 27} Appellant argues trial counsel provided ineffective representation by failing to request a second competency evaluation at the same time counsel requested a second NGRI evaluation. Though he acknowledges Dr. Kurzhals' report indicated he was competent to stand trial, appellant nonetheless argues defense counsel should have requested a second competency evaluation as the underlying basis for the initial competency exam—his mental health diagnoses and familial history of mental health issues—remained the same. We find no merit to appellant's argument.

{¶ 28} Several of our fellow appellate districts have concluded that a trial counsel's failure to seek a second competency evaluation does not amount to ineffective assistance

of counsel. *See In re S.M.*, 2009-Ohio-3118, ¶ 13 (4th Dist.); *State v. Hill*, 2006-Ohio-859, 23 (6th Dist.), *reversed on other grounds*, *In re Ohio Criminal Sentencing Statutes Cases*, 2006-Ohio-4086; *In re Gooch*, 2002-Ohio-6859, ¶ 29-31 (2d Dist.); *State v. Grubbs*, 129 Ohio App.3d 730, 734 (2d Dist. 1998). Those courts are in agreement that "[w]here there is no indication that a second examination would reveal a different conclusion, 'a defendant is hard-pressed to establish ineffective assistance of counsel for failing to request a second exam.'" *State v. Norris*, 2025-Ohio-1976, ¶ 38 (4th Dist.), quoting *In re S.M.* at ¶ 13. We agree with the rationale expressed by those courts.

{¶ 29} Dr. Kurzhals conducted a competency exam in December 2024 and found that appellant was "capable of understanding the adversarial nature and objective of the proceedings pending against him" and was able to assist counsel in his defense. Nothing in the record before us indicates circumstances changed between the initial competency evaluation and trial. As there is no evidence in the record indicating that a second competency examination would have resulted in a different conclusion, we find that trial counsel was not ineffective for not requesting a second evaluation.

### Failure to Object to Prior Bad Acts Evidence

{¶ 30} Appellant argues that trial counsel was ineffective for not objecting to the State's presentation of evidence that he assaulted another cellmate prior to the altercation with Wray. Appellant maintains that such testimony constituted impermissible "other acts" evidence under Evid.R. 404(B) that should have been objected to by defense counsel and excluded from evidence as it was only offered by the State to show his propensity or inclination to commit a crime or that he acted in conformity with bad character.

{¶ 31} Appellant's recorded interview with Trooper Shuler was admitted into evidence and played before the jury. During the interview, appellant stated that he

"crashed on his last cellmate." Trooper Shuler was questioned about appellant's statement as follows:

> [PROSECUTOR]: During your interview with [appellant], he made reference I think to this term "crashing, crashed on." He had "crashed on his cellmate." What does that term mean within your experience within the prison?
>
> [SHULER]: It means a physical altercation, either a fight or a targeted assault. It may or may not include gang motives or weapons.
>
> [PROSECUTOR]: Okay, so it's a slang, prison slang term for an assault, assaulting someone?
>
> [SHULER]: Yes.
>
> [PROSECUTOR]: Okay. Physical violence against someone?
>
> [SHULER]: Yes.
>
> [PROSECUTOR]: And his statement was that he had "crashed on his last cellmate," right?
>
> [SHULER]: That's correct.
>
> [PROSECUTOR]: Meaning Mr. Wray?
>
> [SHULER]: Yes
>
> THE COURT:  Counsel approach.

{¶ 32} At a sidebar, the court questioned "whether or not that's objectionable. And his past behavior with someone else." The prosecutor responded that he was "trying to focus that on the statement just related to Mr. Wray. . . In listening to the statement, they were trying to get him to talk about Mr. Wray. He started talking about a previous cellmate and then he made a statement about Mr. Wray. . . . I was trying to make sure we weren't talking about a different cellmate." The following discussion then occurred:

> THE COURT: Well, what I want to do is get a record here of why [defense counsel] is not objecting. Because that could be an issue at some point.

[DEFENSE COUNSEL]: Your Honor, I know the issue came up when [appellant] was asked [by law enforcement] how he got in the TPU [section of the prison] to begin with; it's because he got in a fight with another celly.

. . .

The fact that [appellant] feels paranoid that people are out to get him and he did what he did to try to avoid getting hurt himself goes to his motivation, his intent. So the fact that this is a common – with him actually it's understandable in the context that this is what happened in this case with Mr. Wray is that he felt threatened and he struck out. But not with the intent – the specific intent to commit murder.

{¶ 33} The State argues that appellant's statement that he had "crashed on his last cellmate" was actually a reference to assaulting Wray. Appellant maintains in his appellate brief that the statement was a reference to assaulting a different inmate—the cellmate that preceded Wray. We have reviewed the entirety of the recorded interview and find appellant's statement that he "crashed on his last cellmate" ambiguous as to whether the statement related to Wray or to a prior cellmate. It is unclear who appellant was referring to at the time he made the statement. For purposes of addressing appellant's ineffective assistance of counsel claim, we will assume the statement referenced a prior cellmate, one whom appellant assaulted before Wray.

{¶ 34} Defense counsel indicated to the trial court that he did not object to appellant's statement about previously assaulting a prior inmate as a matter of trial strategy. Counsel explained that he wanted the statement in evidence to provide context for appellant's paranoia and belief that people were out to get him and to show that he did not have the intent to murder Wray. "[A] failure to object is viewed as trial strategy and alone will not establish an ineffective assistance claim." *State v. Arrone*, 2009-Ohio-1456, ¶ 24 (12th Dist.). This is true even where the trial strategy ultimately proves unsuccessful or where there was another possible, better strategy available. *State v. Woody*, 2020-

Ohio-621, ¶ 11 (12th Dist.), citing *State v. Davis*, 2013-Ohio-3878, ¶ 25 (12th Dist.). Here, trial counsel's trial strategy ultimately proved successful—appellant was found not guilty on the more serious offense of attempted murder. We therefore find that trial counsel's performance was not deficient and appellant cannot demonstrate that he received ineffective assistance of counsel for counsel's decision not to object to the evidence.

**Failure to Request PSI or Present Mitigation**

{¶ 35} As his final argument, appellant contends trial counsel was ineffective for not requesting that a PSI be prepared for sentencing and for not presenting mitigating evidence at sentencing. Appellant maintains that "[g]iven the mental health of the defendant, counsel had an obligation to request time to assemble mitigating factors in an effort to minimize the penal impact of any ultimate sentence." We find no merit to appellant's arguments.

{¶ 36} Contrary to appellant's arguments, the record reflects that trial counsel did present mitigating evidence at sentencing. Trial counsel spoke about appellant's schizophrenia and bipolar diagnoses. Counsel then noted that appellant had not intended to kill Wray or cause him serious physical harm, but had acted out of paranoia and fear that Wray intended to do him harm. Counsel spoke about appellant's efforts to get Wray help once he realized how seriously Wray was hurt, noting that appellant had been the one to first alert the corrections officers by calling for medical assistance. Though appellant believes counsel could have presented additional mitigating evidence and could have requested a PSI to obtain such evidence, we cannot say that counsel's performance was deficient. "[T]he extent to which counsel presents mitigation evidence at sentencing is a matter of trial strategy." *State v. Runion*, 2022-Ohio-2461, ¶ 11 (12th Dist.), citing *State v. Brewer*, 2021-Ohio-2289, ¶ 14 (12th Dist.).

- 15 -

{¶ 37} We further find that appellant has failed to demonstrate he was prejudiced by counsel's decisions not to present additional mitigating evidence or request a PSI. There is no evidence in the record to indicate that the trial court would have sentenced appellant any differently had counsel offered additional mitigating evidence. *See Brewer* at ¶ 15. In imposing a sentence of a minimum of 8 years to a maximum of 12 years in prison, the trial court considered the mitigation evidence that was presented by trial counsel, the facts of the case, the serious harm done to Wray, and the need to punish appellant and protect the public. It is purely speculative to believe a lesser sentence would have been imposed in this case given the serious nature of the offense and appellant's criminal record.

{¶ 38} Accordingly, for the reasons stated above, we find no merit to any of appellant's claims of ineffective assistance of counsel. Appellant's sole assignment of error is overruled.

{¶ 39} Judgment affirmed.

BYRNE, P.J., and SIEBERT, J., concur.

# **J U D G M E N T   E N T R Y**

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robert A. Hendrickson, Judge*

*/s/ Melena S. Siebert, Judge*